UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY  DIVISION

| | | |
|---|---|---|
| The ESTATE OF JESSICA BURCH, deceased; MARTINA DILLON, individually and as Administratrix of the Estate of Jessica Burch; K.J.R., a minor child of Jessica Burch, individually; and, D.R.B., a minor child of Jessica Burch, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>STEVE KNIGHT, Floyd County Jail commander, individually and in his official capacity; FLOYD COUNTY, INDIANA; DARRELL MILLS, Floyd County Sheriff, individually and in his official capacity; CARL BANET, Floyd County Jail Corrections Officer, individually; and, JOHN & JANE DOE(S), Floyd County Correctional Officers, individually,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 4:09-cv-139-SEB-WGH |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment,

filed on August 12, 2011, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Plaintiffs, Martina Dillon, individually and as administratrix of the Estate of Jessica

Burch, K.J.R. and D.R.B., the minor children of Jessica Burch, and the Estate of Jessica

Burch, a/k/a The Estate of Jessic Burch (collectively, "the Estate"), bring this claim

pursuant to 42 U.S.C. § 1983 against Defendant Eddie Mayfield, in his individual

capacity, alleging that Mayfield violated the constitutional rights of Jessica Burch.[1]  The

Complaint also asserts a state law claim for wrongful death pursuant to Indiana Code §

34-23-1-1 against all Defendants.  For the reasons detailed in this entry, we grant

Defendants' Motion for Summary Judgment.

## Factual Background

On April 7, 2009, the decedent, Jessica Burch, was arrested outside the Walmart

located in New Albany, Indiana.  Ms. Burch was in the company of three of her relatives

at the time, including her cousin, Glynnis Williams.  The entire group was arrested and

each individual was charged with shoplifting or another charge related to shoplifting.  Ms.

Burch, who was twenty-five years old at the time of her arrest, was charged with

"assisting a criminal."

After their arrests, Ms. Burch and Ms. Williams were transported to the Floyd

County Jail in separate vehicles.  Ms. Burch arrived at the jail first and was processed.

According to Ms. Williams, when she arrived at the jail, she witnessed Ms. Burch crying

during the book-in process, but testified (by deposition) as of that time she saw nothing to

cause her to believe that Ms. Burch was at risk of suicide or some other form of  self-

---

[1] In their response in opposition to the instant motion, Plaintiffs abandoned all other
federal claims and their state claim of a state constitutional violation.  Accordingly, we address
only the § 1983 claim brought against Officer Mayfield and the wrongful death claim asserted
against all Defendants.  We hereby GRANT summary judgment on all other federal claims and
the claim of a state constitutional violation.

harm.  A video camera located in the booking area of the jail captured, via digital image, most of Ms. Burch's activities during the booking process, including being escorted to and from her cell, which was located immediately behind the booking desk area.  The video taken by that camera has been submitted as part of the record.  While it is not sufficiently detailed to reveal a person's facial expressions or to disclose whether she may have been crying or shedding tears, the video does clearly reveal the physical movements and activity by anyone caught within the camera's field of vision.  Ms. Burch was involved in no physical encounters while being booked, appearing calm and compliant throughout the process.

The policy of the Floyd County Jail requires each incoming detainee to undergo a medical assessment interview.  Ms. Burch's assessment indicates that she had recently been diagnosed with cervical cancer, that she had been prescribed Flexeril, Valium, and Percocet, which she had brought to the jail with her, and that she had a four inch scar on her hand.  With regard to her mental health, the assessment provided the following additional relevant information:

- Does inmate show signs of depression? NO
- Does inmate appear anxious, afraid, or angry? NO
- Does inmate appear to be unusually ashamed or embarrassed? NO
- Is inmate acting or talking in a strange manner? NO
- Inmate's mental status upon entrance to the jail.  Stable or Unstable? STABLE
- Have you experienced a broken relationship, loss of job, or death of someone close in the last six months? Y – SEPARATED FROM HUSBAND
- Has anyone close to you ever committed suicide? NO

- Do you feel like harming or killing yourself? NO
- Are there any visible signs of self mutilation or self abuse? NO
- Have you ever attempted suicide in the past? NO
- Do you feel hopeless about the future, or that there is nothing to look forward to? NO
- Have you ever been treated for emotional, drug/alcohol related illnesses? If yes, when where ... NO

Medical Assessment ¶¶ 14-26.

After she was processed, Ms. Burch was placed alone in cell BH2, located immediately behind the main control desk. At all times relevant to this litigation, cell BH2 was equipped with a video surveillance system. Although Ms. Williams and Ms. Burch's other relatives who had been arrested were placed in cells occupied by other inmates, Burch was housed alone continuously throughout her stay. According to Ms. Williams, she could see Ms. Burch from her cell and they were able to communicate between themselves by reading each other's lips. In her deposition, Ms. Williams testified that at no time during the evening of April 7 or into the next day prior to their arraignments did she believe that Ms. Burch was at risk of harming herself.

On April 8, 2009, Ms. Burch, Ms. Williams, and the others who had been arrested at Walmart were escorted to court for arraignment. A video camera in the courtroom recorded the proceedings. Williams, who was arraigned first, became so upset over the amount of the bond that was set for her that she had to be physically helped from the courtroom and escorted back to the booking area by Officer Mayfield and other officers. Thus, Ms. Williams was the first person returned to her cell prior to the arraignment of

4

Ms. Burch and the others in the group.[2]  Officer Mayfield returned to the courtroom after having  escorted Ms. Williams to her cell, arriving prior to the completion of the next detainee's arraignment.  Due to her emotional breakdown in the courtroom, arrangements were made for Ms. Williams  to consult a counselor from the LifeSpring Office, the jail's mental health department.

The video taken in the courtroom during the arraignment hearings shows that Ms. Burch was seated behind the podium where each individual stands while addressing the judge.  She remained calm throughout the arraignments of Williams and another individual, both of whom preceded her.  Near the conclusion of her arraignment, Ms. Burch also broke down, becoming upset and crying.   Officer Mayfield who had been standing near the front of the courtroom at the time approached Ms. Burch to assist her departure from the courtroom at the conclusion of her arraignment.  Burch along with another inmate were returned to jail, escorted by a guard.

As Ms. Burch was being returned to cell BH2, she had an opportunity to look into the cell where Ms. Williams was detained.  Williams testified that Burch was crying and seemed dazed and "looked sad," but, as confirmed by the video, Burch was calm and was escorted in an orderly fashion to her cell.

_____

[2] Usually, all inmates who are transported together for a court appearance also return together as a group.

Almost immediately after returning Ms. Burch to her cell, Officer Mayfield opened the cell door to Williams's cell to escort her to the LifeSpring Office to meet with the mental health professional, Daraius Randalia.  Williams avers that she informed Officer Mayfield at that time that Burch was acting strangely, that she was worried about Burch's condition and that Burch needed attention from the staff.  Ms. Williams further testified that she told Officer Mayfield that Ms. Burch should not be left alone in such an emotional  state and that she needed to be monitored.  Williams recounts that Officer Mayfield responded, saying "Don't tell me how to do my job," but Mayfield disputes that Williams said anything to him about Ms. Burch at the time.

After escorting Williams to the LifeSpring Office, Officer Mayfield returned to Ms. Burch's cell, entered it, and checked on her, remaining in the cell slightly more than a minute.  Officer Mayfield testified that his conversation with Ms. Burch included an explanation of the results of the arraignment, the amount of her bail, how she could post her bail, and other issues relevant to her criminal case.  According to Mayfield, Burch did not appear to be upset, despondent, or depressed, nor did she display any other outward emotions or express any desire to harm herself during his conversation with her.  Officer Mayfield further testified that, had Burch given any such indication or cause for concern, he would have taken her to the LifeSprings office for a consultation, as he had with and for Ms. Williams.

Williams testified that while she was with Officer Mayfield and Mr. Randalia in the LifeSpring office, she expressed concerns to both of them about Ms. Burch's emotional condition in an effort to convince them to house Burch in the same cell with Williams. She told them Burch was not acting like herself and again urged them to check on her. The LifeSpring office was located directly across from Ms. Burch's cell, so Williams was able to see Burch trying to communicate with her through her cell window. Ms. Williams was allowed to telephone her mother, Billie Taylor, to whom she reported her concerns regarding Ms. Burch, indicating that Burch did not seem right and that something was wrong with her. In order to gain Williams's attention in an attempt to determine to whom she was speaking, Ms. Burch banged on her cell door and window. Williams states that she understood Burch to want Willimas to call Burch's mother as well. During the conversation with her mother, Williams was mouthing a response to Burch while also pressuring Officer Mayfield to check on Burch, only to be told by Officer Mayfield and Mr. Randalia to calm down. Before long, Mayfield told Williams to quit trying to communicate with Ms. Burch or he would have to end the telephone call Williams was engaged in wither her mother.

According to Ms. Williams, during this time Burch had her face pressed against the glass of the cell door with her eyes wide open and looked like she was "going crazy." Williams's mother advised Williams during their telephone conversation to report her concerns about Burch to the guards. Ms. Taylor testified that she heard one of the

officers tell Williams to quit looking over at Burch or he would have to end the telephone call.  Despite Williams's contention that she could not get Mayfield or other officers to pay proper attention to Ms. Burch, during the approximately thirty minutes that Ms. Williams was out of her cell consulting with Mr. Randalia, Officer Mayfield visually checked on Ms. Burch on three separate occasions, the last of which occurred at approximately 3:45 p.m.  Mayfield asserts that at no time did Ms. Williams tell him that Ms. Burch was a suicide risk.

After Ms. Williams's consult with the LifeSpring office concluded and she returned to her cell, she and Ms. Burch again communicated for a period of time through the glass of their respective cell windows.  Eventually, however, Ms. Williams moved away from the glass and could no longer see into Ms. Burch's cell.  The video camera located in Ms. Burch's cell confirms that shortly after her last visual interchange ended with Ms. Williams, Ms. Burch began to tie her bed sheet into a ligature and, at 4:12 p.m., she hanged herself by wrapping the bed sheet around the frame of the upper bunk in her cell and placing it around her neck.

Slightly more than an hour later, at approximately 5:16 p.m., a jail employee, Edward Asher, informed officers in book-in that a female in cell BH-2 had hanged herself.  Officer Carl Banet and Sergeant Patricia Watkins went immediately to cell BH-2, released Ms. Burch from the ligature and moved her body outside the cell in order to perform CPR.  At approximately 5:17 p.m., Officer Kenneth Walker contacted the New

Albany Emergency Center and advised them of the suicide. At that time, Officer Keisha Brooks, the department medical officer and certified Emergency Medical Technician, arrived and immediately requested the Automated Electronic Defibrillator ("AED"), which was retrieved by Officer Scott Kinderman. Officers Brooks, Watkins, Kinderman and Banet continuously administered CPR during the ensuing moments, but, at approximately 5:20 p.m., the AED stated "no shock advised," instructing the officers to continue CPR, which they did until the New Albany Fire Department arrived at 5:26 p.m. to take over Ms. Burch's medical treatment. Ms. Burch was transported to the hospital at approximately 5:37 p.m., but never could be revived.

At the time of Ms. Burch's death, the Floyd County Jail had an inmate supervision policy in effect. The policy provided in relevant part as follows:

> There shall be sufficient jail personnel present in the jail to provide adequate twenty-four (24) hour supervision of inmates.
>
> 1.    A jail officer shall provide personal observation, not including observation by a monitoring device, of each inmate at least once every sixty (60) minutes. Such observation may be conducted on an irregular schedule.
>
> 2.    High risk, suicidal inmates shall be provided appropriate supervision consistent with that behavior.

Exh. B (Floyd County Sheriff's Department Jail Operations Manual) to Sands Aff. As discussed above, prior to her suicide, Officer Mayfield last personally checked on Ms. Burch at 3:45 p.m. From the video taken by the camera located in her cell, it is estimated that she hanged herself at approximately 4:12 p.m., but was not discovered by jail

personnel until 5:16 p.m.

This litigation ensued, brought by Ms. Burch's Estate on behalf of her minor children against Defendant Mayfield individually and the Floyd County Defendants in their official capacities.

## Legal Analysis

### I. Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

## II.    Section 1983 Claim:

Plaintiffs have brought their federal claim under 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

To recover under § 1983, Plaintiffs must establish that Ms. Burch was deprived of a right secured by the Constitution or laws of the United States by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Accordingly, Plaintiffs claim that Officer Mayfield, acting under color of law, was deliberately indifferent to the substantial risk that Ms. Burch would commit suicide or otherwise harm herself while in custody, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

The Eighth Amendment's prohibition against "cruel and unusual punishments" requires "prison officials to take reasonable measures to guarantee the safety of inmates ...." *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Although the Eighth Amendment applies only to individuals who have been convicted, the Seventh Circuit has held that pretrial detainees such as Ms. Burch are entitled to at least as much protection under the Fourteenth Amendment's due

process clause.  *Board v. Farnham*, 394 F.3d 469, 477-78 (7th Cir. 2005).  Accordingly,

the same legal standards apply to deliberate indifference claims brought under either the

Eighth or Fourteenth Amendment.  *Thomas v. Cook County Sheriff's Dep't*, 588 F.3d 445,

452 n.1 (7th Cir. 2009).

    To succeed on such a claim, a plaintiff must establish that: (1) the harm threatened

to the detainee was objectively, sufficiently serious, and posed a substantial risk to her

health or safety; and (2) that the defendant was deliberately indifferent to the detainee's

health and safety.  *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citing *Farmer*,

511 U.S. at 832).  In prison suicide cases, the objective element is automatically met

because there can be no dispute that "suicide is an objectively serious harm."  *Matos ex*

*rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003).  Accordingly, in the case

before us,  we need address only the second prong of the test:  was Defendant deliberately

indifferent to Ms. Burch's health and safety?

    In order to establish deliberate indifference, a plaintiff must be able to prove that

the defendant: (1) subjectively knew the detainee was at substantial risk of committing

suicide; and (2) intentionally disregarded the risk.  *Collins*, 462 F.3d at 760 (citing *Matos*,

335 F.3d at 557).  To satisfy the subjective component, it is insufficient to establish

merely "that there was a danger of which a prison official should have been aware."

*Collins*, 462 F.3d at 761 (quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226

F.3d 525, 529 (7th Cir. 2000)).  Instead, the plaintiff must show that the official was

"aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw that inference*." Id. (emphasis added). A plaintiff may establish subjective awareness of the risk by establishing that the risk was obvious. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996).

In this instance, Plaintiffs claim that a combination of circumstances put Officer Mayfield on notice that there was a substantial risk that Ms. Burch was going to do harm to herself. Those circumstances include:

- Ms. Burch's behavior at the close of her arraignment,
- Ms. Burch's continual crying,
- Ms. Burch's "looking crazy" and pounding on her cell window or door to gain Ms. Williams's attention;
- Ms. Williams informing Officer Mayfield that Ms. Burch was not acting like herself along with her various pleas to him to check on Burch.

Unfortunately for Plaintiffs, even accepting Williams's recitation of events and circumstances as true, the evidence falls far short of creating a question of fact as to whether Mr. Mayfield had been alerted to or put on notice of an obvious threat of Ms. Burch committing suicide. In reviewing the evidence, it is important to note that the facts arose out of an arrest and detention, suggesting that it is not altogether unusual that persons finding themselves in such circumstances would react emotionally or with apparent despair. Such reactions do not necessarily signal that the detainee will be driven to a point of inflicting harm upon him or herself simply by virtue of the detention. The video evidence recording the general behavior of Burch during the booking process and at

her arraignment reveal no conduct on anyone's part that would suffice as notice to Mayfield of the risks Ms Burch apparently posed. It is entirely appropriate for a court to rely on video evidence at the summary judgment stage if it contradicts less reliable evidence. *Griffin v. Hardrick,* 604 F.3d 949, 954 (6th Cir. 2010).

Officer Mayfield's personal involvement with Ms. Burch began when she and the other arrestees were escorted from their cells to their arraignments. Burch was exhibiting no particular emotional distress; in fact, she appeared far less upset at the close of her arraignment than did Williams at the end of her hearing. When returned to the booking and holding cell area, Burch was neither stooped over nor crying uncontrollably as was Williams. Plaintiffs' description of Burch as "hysterical" at this point is simply not borne out by the video evidence. In contrast, for Officer Mayfield to have paid primary attention to the immediate emotional and mental health needs of Williams was entirely reasonable. Similarly, Mayfield was far from neglectful in giving priority to the consultation in progress between Williams and the mental health counselor rather than yielding to directions being given by Williams. It is irrelevant whether Mayfield acted in response to Williams's pleas or some other prompt because, in fact, he did check on Burch several times during the period shortly after she returned from her arraignment, and each time he made such a check, the uncontroverted evidence establishes that Burch was not overtly emotional or exhibiting signs of an intention or desire to harm herself. There simply is no evidence to prove that Mayfield ever saw Burch "looking crazy" as she

15

peered out through the window of her cell, as described by Williams.  Given that

Williams herself testified that while she was in the  LifeSpring office across from Burch's

cell, she was unsuccessful in convincing Mayfield and the counselor to pay attention to

Burch, we conclude that Mayfield never did personally witness Burch exhibiting "crazy"

looks or other such behavior.

Plaintiffs contend that in analyzing the available evidence we should rely on three

Seventh Circuit decisions which support their argument that summary judgment is

inappropriate in this case.  First is *Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003), a

case where a detainee who had been arrested for kidnapping following a three hour stand-

off with police, committed suicide in jail in Champaign County, Illinois before his request

to see a mental health counselor could be granted.  The detainee's mother was at the jail

when her son was being processed and was interviewed by the defendant police officer

assigned to investigate the incident.  *Id.* at 619.  She claimed she specifically requested

that her son be put on suicide watch and gave the defendant detailed information

regarding her son's poor mental health condition.  *Id.*

In addition to the detainee's mother, the defendant officer spoke with the kidnap

victim, a former girlfriend of the detainee, who informed him that the detainee had

threatened to kill himself as well as her while he was holding her against her will.  *Id*.

The detainee also specifically asked the defendant officer to be allowed to see a mental

health professional, though he later informed the officer that he was feeling fine and was

not suicidal.  *Id.*  The defendant officer claimed that he did not believe that the detainee was a suicide risk and thus did not recommend to jailers that he be put on suicide watch. The detainee was assigned to a holding cell with a telephone having a hard cable cord. *Id*. at 619-20.  During his incarceration he made phone calls to his ex-girlfriend until the defendant officer called the jail and instructed the jailers to stop his calls.  *Id.*  The detainee again asked to see a mental health professional and was told that one would be coming to visit him, but before that meeting occurred, he hanged himself by the telephone cord, the residual injuries from which left him in a permanent vegetative state.  *Id.*

The defendant officer appealed the district court's denial of qualified immunity in the ensuing § 1983 lawsuit instituted by the detainee's estate.  *Id*. at 618.  With respect to the issue of deliberate indifference, the Seventh Circuit found that after crediting all evidentiary inferences in favor of the plaintiff, as they must, a trier of fact could conclude that the information provided by the detainee's mother and the victim of the kidnaping was sufficient to credit him with the knowledge that there was substantial risk of suicide and that the officer was subjectively reckless in ignoring that risk and not alerting the jailers to that risk.  *Id.* at 621-22.  A trial therefore was necessary.

Plaintiffs in the case at bar seek to establish a similarity between Mayfield's actions and those of the defendant officer in *Cavalieri.*  This is quite a rhetorical stretch, however, since the factual distinctions make the cases clearly inapposite.  No one, for example, ever informed  Mayfield that Burch was a likely suicide risk.  Neither did Burch

ever request to see a mental health professional. She had never threatened suicide or been part of criminal conduct that called into question her mental stability, such as an armed stand-off with police, or had any known mental health issues, as had the detainee in *Cavalieri*. The *Cavalieri* case is factually distinguishable from the case at bar in highly material ways and thus the conclusions reached there do not undermine the conclusions we reach here.

Next, Plaintiffs cite *Collins v. Seeman*, 462 F.3d 757 (7th Cir. 2006) as supportive of their contention that Mayfield did not respond properly or adequately to the facts of which he had been made aware regarding Burch's poor mental or emotional status. *Collins* involved a § 1983 claim brought by the estate of a prisoner housed at a correctional facility who had committed suicide less than an hour after informing one of the correctional officers that he was "feeling suicidal." *Id*. at 759. After the prisoner acted on that impulse without intervention from or by the correctional officials who had known of the threatened harm, three correctional officers were sued by his estate. *Id*.

The three officers sued included the officer who was monitoring the cell block and who had been directly informed by the prisoner that he was suicidal, the officer who at the shift change relieved the first officer from his cell monitoring duties, and the crisis counseling officer who did not arrive in time at the prisoner's cell to prevent the suicide. *Id*. at 759-60. As in *Cavallieri*, one of the defendant officers in *Collins* had been informed by the prisoner that he needed to talk to a mental health professional. *Id.* In

fact, that defendant was specifically told by the prisoner of his desire to kill himself. *Id*.

That officer relayed the request for a mental health professional to the control room, but

somehow the prisoner's suicidal intentions failed to get communicated, so the response

given to the reporting officer was to tell the prisoner that the crisis counselor on duty

would stop by his cell as soon as she finished escorting some other prisoners elsewhere in

the prison. *Id*. The defendant officer passed that information to the prisoner, who

responded that he would be alright while awaiting the arrival of the crisis counselor. The

defendant officer checked on the prisoner one more time before being relieved by the

third defendant. *Id*. Upon his arrival on duty, the third defendant officer was informed

that the crisis counselor was due to check on the prisoner, and about ten minutes later he

looked in on the prisoner who was awaiting the counselor's arrival to his cell. *Id*. at 760.

Fifteen minutes thereafter, when the officer returned to the prisoner's cell, he found that

the prisoner had hanged himself. *Id*. At the moment of that tragic discovery, the crisis

correctional officer was located in the health care unit and had just undertaken a review of

the decedent's file in preparation for meeting with him. *Id*.

The district court in *Collins* granted summary judgment in favor of all three of the

correctional officer defendants finding that each had acted reasonably in response to the

request for mental health assistance by the prisoner and without deliberate indifference.

*Id*. The Seventh Circuit affirmed the lower court's decision, agreeing that there was no

evidence that the second and third officers had been placed on notice of any imminent,

substantial risk that the prisoner might take his own life.  *Id.* at 761.  About the officer to whom the prisoner had directly stated that he was "feeling suicidal," the Court of Appeals wrote:

> The deliberate indifference standard imposes a "high hurdle" for a plaintiff to overcome.  *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir.2002). Although Collins initially informed Officer Shuck that he was feeling suicidal, the undisputed evidence establishes that just a few minutes later he told the officer he would be all right until the crisis counselor arrived. After relaying Collins's request for the crisis counselor, Shuck continued to monitor Collins until Officer Bucalo took over. There is nothing in this record to support an inference that Shuck intentionally disregarded a known, imminent suicide risk.

*Id.* at 762.

Given the Seventh Circuit's affirmance of summary judgment in favor of all three defendants in *Collins,* including a defendant who was specifically told by the decedent that he was "feeling suicidal," it would be difficult to justify a different conclusion on the facts of this case.  Plaintiffs' misplaced reliance on *Collins* as precedent for finding that a material question of fact exists with regard to Officer Mayfield's reaction to Burch's crying and her cousin's warnings to keep an eye on Burch, when the cousin was also detained and decidedly more emotionally demonstrative than was the decedent, is perplexing at best.  By our estimates, *Collins* provides a compelling basis for ruling in favor of Mayfield, not to the contrary.

Finally, Plaintiffs cite *Estate of Hill v. Richards*, 525 F.Supp.2d 1076 (W.D.Wis. 2007) as persuasive authority for avoiding summary judgment.  That case also involved a

jail suicide.  A defendant social worker at the jail had direct knowledge of the detainee's history of depression and suicidal ideations and was informed during an interview of that detainee conducted shortly after her arrest that immediately prior to her arrest she had tried to open a vein in her arm by using a tack.  *Id.* at 1077.  When the social worker was thereafter sued for being deliberately indifferent to the detainee, the district court denied summary judgment on the grounds that there remained a material question of fact concerning whether the social worker was  aware of an imminent danger that the detainee might do substantial harm to herself and, if so, whether her failure to put the detainee on suicide watch or recommend follow-up care was an inadequate response to the information she had gained.  *Id*. at 1089.  Even if we were bound by this decision from a sister district court in our circuit, we could not ignore the obvious significant differences in the facts between the *Estate of Hill* and our case, beginning with the fact that the evidence here conclusively and unequivocally establishes that Mayfield had no knowledge of any mental health issues that Burch may have had and that he was not informed that she was suicidal or harbored intentions of doing harm to herself.  In addition, there is no dispute that Mayfield had never been notified that Ms. Burch had recently or at any time previously attempted to harm herself prior to her arrest.

In the end, none of the authorities cited by Plaintiffs dealt with a factual scenario which bore anything other than a quite vague comparison to the circumstances in the case before us.  After careful review, it is clear that in our case there is insufficient evidence to

support a jury finding that Officer Mayfield knew prior to Burch's suicide that she was at risk of doing substantial harm to herself and that he intentionally ignored that risk. Therefore, no constitutional violation has occurred based on these facts, and Officer Mayfield is entitled to summary judgment on Plaintiffs' § 1983 claim against him.

## III.    Wrongful Death

Plaintiffs have brought a wrongful death claim against all the named defendants asserting that Ms. Burch's death was the result of their neglect.  The elements of a wrongful death claim based upon negligence are "a duty owed by the defendant to the decedent, breach of that duty, and an injury proximately caused by the breach." *Tom v. Voida*, 654 N.E.2d 776, 787 (Ind.Ct.App.1995).

In 1998, the Indiana Supreme Court handed down a ruling interpreting state law regarding the "standard of liability of jailers for the suicide of a person in their custody." *Sauders v. County of Steuben*, 693 N.E.2d 16, 17 (Ind. 1998).   There the Court wrote:  "It is well settled that a custodian under some circumstances has a legal duty to take steps to protect persons in custody from harm." *Id.* at 18.  However, the court noted that the custodian is not an insurer against harm and there is no duty to prevent a particular act, such as suicide. *Id.*  "[T]he duty is to take reasonable steps under the circumstances for the life, health, and safety of the detainee" and what those reasonable steps might be will vary with the facts and circumstances presented in each instance. *Id.*  "The degree of

notice that suicide is a risk is of course a critical factor in assessing the reasonableness of the steps taken.  If the suicidal tendencies of the inmate are known, the standard of care required of the custodian is elevated."  *Id.* at 19.

Plaintiffs contend that *Sauders* imposes a heightened duty on all the Defendants to closely monitor Ms. Burch.  Specifically, Plaintiffs state that:

> A duty arose to monitor Jessica from the time of her arrival at the jail based on the circumstances learned during her book-in.  A duty arose to monitor Jessica based on her housing assignment in isolation.[3]  A duty arose to monitor Jessica based on her breakdown in court. A duty arose to monitor Jessica after the jail was warned that she was unfit to be left unattended inside an isolation cell. A duty arose to continue the increased monitoring of Jessica once it commenced, since the risk did not abate. A duty arose for Mayfield to alert his supervisor and other staff of the warnings that he had received. All of these duties were breached by the jail. These breaches resulted in Jessica's death.

Dkt. #49 at 31.

Plainly, Plaintiffs have misinterpreted the *Sauders* holding.  The Indiana Supreme

---

[3]The evidence is that Ms. Burch was placed in a cell by herself, though Ms. Williams was placed in another cell which housed other detainees.  Burch's cell could accommodate more than one person, but no one else had been assigned to that cell at that time.  Plaintiffs refer to Burch being placed  in isolation and contend that the jailers failed to follow the jail's policy for placing someone in isolation.  Defendants contend that Burch was not placed "in isolation" or in an "isolation cell" but was simply at that time the only person placed in the cell.  The record is not developed enough for the court to draw any conclusions with regard to the significance, if any, of a detainee being placed "in isolation" as compared to being housed in a cell which was large enough to accommodate others, but was not being used to house others at the time.  In any event, it appears that the policy that Plaintiffs argue was breached relates to the requirement that some type of official form be completed when a detainee is placed in an  "isolation cell." Besides the fact that there is no evidence that Burch was placed in isolation as the type of prescribed detention for her, it has not been alleged that the failure to complete the required form was a contributing cause of her death.

court made clear that no specific duty exists requiring the prevention of a suicide; instead, the duty owed is to take reasonable steps to provide for a detainee's safety. *Sauders,* 693 N.E.2d at 17-18. *Sauders* instructs that a heightened attention and response is called for "[i]f the suicidal tendencies of the inmate are known." *Id*. at 18. Nothing in this record before us indicates that any of the Defendants had received any indication or notice that Burch had suicidal tendencies. In fact, Ms. Burch denied having any such thoughts during her intake interview as recorded on the official forms and, further, she never demonstrated any behavior to the authorities at the jail beyond her crying episode while being processed into the jail. Crying is not so uncommon or excessive a reaction on the part of a recent arrestee as to put the correctional officers on notice of a total impending emotional collapse or the sort of mental decomposition that relates to a suicide. And, in any event, the record reveals that Officer Mayfield did check on Ms. Burch three times while she was in her cell following her emotional departure from the arraignment and on each occasion she reportedly showed no signs of despondency or collapse. Thus, we conclude as a matter of law that no breach occurred by any of the Defendants of their duty to take reasonable steps to provide for and protect the life and safety of Burch while she was in custody.

In the end, the death of Jessica Burch was unmistakably a great tragedy. The resultant pain to her family and irreparable loss to her young children are beyond measure. Having chosen to take her own life, she left lifelong scars on all those who

loved her and have now been deprived of her companionship. But these losses, real as they are, were not the result of any violation of her constitutional rights or negligence by the jail officials. Frankly, we imagine the officers were as shocked and saddened by these events as were the members of Ms. Burch's family who were left behind after she took her own life, given that the evidence shows that all the involved jail personnel apparently did everything they could to provide her safe, sympathetic supervision and then to revive her after their unexpected discovery.

## IV. Conclusion

For the reasons explicated in this entry, the Defendants' Motion For Summary Judgment (Dkt. #42) is <u>GRANTED</u>. A separate Judgment in favor of all Defendants and against all Plaintiffs will issue, each party to bear its own costs and fees.

IT IS SO ORDERED.

Date: 01/20/2012

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP
jlowe@k-glaw.com

Jeff Davis Wenning
THE WENNING LAW OFFICE
jdwenning@insightbb.com